IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| NOVA CECIAL SIVERD, | Case No. 1:16-cv-2740 |
| Plaintiff, | JUDGE CHRISTOPHER A. BOYKO |
| v. | MAGISTRATE JUDGE THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | **REPORT & RECOMMENDATION** |

**I.     Introduction**

Nova Cecial Siverd, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income ("SSI) under Title XVI of the Social Security Act. This matter is before the court pursuant to 42 U.S.C. §1383(c)(3), 42 U.S.C. §405(g) and Local Rule 72.2(b).

Because the ALJ did not properly apply Social Security regulations or make it clear that he had a proper basis for discounting the views of Siverd's treating doctor, I recommend that the court VACATE and REMAND the final decision of the Commissioner for further proceedings.

**II.    Procedural History**

Siverd filed an application for SSI on February 14, 2014. (Tr. 92, 113) Siverd alleged her disability began on November 20, 2013. (Tr. 265) Siverd's application was denied initially on March 28, 2014 (Tr. 166) and upon reconsideration on May 5, 2014. (Tr. 175) Siverd requested a hearing on May 5, 2014. (Tr. 175) Administrative Law Judge James M. Martin conducted a

hearing on August 28, 2015. (Tr. 109-142) On September 21, 2015, the ALJ denied Siverd's claims for benefits. (Tr. 89-103) The Appeals Council denied review of the ALJ's decision on September 13, 2016, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-4)

### III. Evidence

#### A. Personal, Educational, and Vocational Evidence

Siverd was 52 years old when she applied for benefits. (Tr. 265) She obtained her GED (Tr. 118) and had past work experience as a quality control inspector at a rubber factory and in housekeeping. (Tr. 119-120)

#### B. Medical Evidence

Siverd first treated with John Lee, D.O., on January 22, 2014. (Tr. 406) She complained of hip and back pain. She was smoking a pack of cigarettes every day but wanted to quit. For the past year she had had a cough, shortness of breath and fatigue. Dr. Lee ordered X-rays and lab work. (Tr. 408)

X-rays taken of Siverd's lumbar spine on January 22, 2014 revealed 1.5 cm spondylolisthesis of L5 on S1, associated with pars defect and narrowed L5-S1 disc space, and concave defect superior endplate L3 vertebrae most likely a Schmorl's node and also osteophytes at L2, L3 and L4. (Tr. 376) X-rays of Siverd's hips and pelvis were normal. (Tr. 373-374)

An X-ray of Siverd's' chest showed blunting of both costophrenic angles and findings consistent with chronic obstructive pulmonary disease ("COPD"). Minimal scoliosis of the thoracic spine convex to the right was also noted. (Tr. 372) A chest CT chest showed emphysema and prominent pancreatic duct with small adjacent cystic areas. (Tr. 370)

On January 29, 2014, Siverd followed-up with Dr. Lee who referred her to pain management, recommended that she stop smoking, and told her to take Vitamin D once a week. (Tr. 403) At an appointment on February 10, 2014, Siverd reported feeling lightheaded since starting blood pressure medication. (Tr. 400)

Siverd met with a pulmonologist, Yisa Sunmonu, M.D., on February 12, 2014. Siverd reported worsening exertional shortness of breath over the last year, labored breathing after walking two blocks, chronic cough and whitish phlegm. Dr. Sunmonu diagnosed shortness of breath on exertion, COPD, chronic bronchitis, tobacco dependence, chronic back pain, mild scoliosis, hypertension and Vitamin D deficiency. (Tr. 395-397)

On February 24, 2014, Siverd complained to Dr. Lee of feeling lightheaded. He noted that she was doing much better after seeing a pulmonologist and starting inhalers. (Tr. 392)

On March 17, 2014, Siverd complained of shortness of breath to Dr. Sunmonu. Dr. Sunmonu noted that Siverd was only smoking a 1/3 of a pack of cigarettes per day. (Tr. 410)

Siverd participated in physical therapy from March 18, 2014 through May 9, 2014 for her lower back and hip pain. She completed 15 out of 16 visits and her goals were partially achieved. (Tr. 438, 439, 450)

On March 26, 2014, Siverd complained to Dr. Lee that physical therapy was aggravating her back pain. Dr. Lee noted that Siverd had been diagnosed with severe COPD by her pulmonologist. (Tr. 418)

On April 7, 2014, Siverd met with Dr. John Hill for pain management. Siverd was experiencing pain with lumbar motion. (Tr. 479) On April 28, 2014, Siverd received a lumbar facet block medial branch nerve block at L3-4, L4, 5 and L5, S1 on the right and left side to treat lumbosacral spondylosis. (Tr. 429-430)

3

On April 24, 2014, Siverd followed-up with Dr. Lee for tobacco abuse and Vitamin D deficiency. Dr. Lee's notes reflect that Siverd was going to receive a cortisone shot for lower back pain and that she was on oxygen at night. (Tr. 476)

Siverd followed-up with Dr. Hill for pain management on May 6, 2014. Siverd had full range of motion with pain in her spine. (Tr. 435) On May 12, 2014, she received a second lumbar facet medial branch block at L3-4, L4-5, and L5-S1. (Tr. 455)

Cynthia Campbell, NP, at the Pain clinic saw Siverd on July 3, 2014. Nurse Campbell noted 4/5 motor strength in Siverd's right lower extremity; positive straight leg raising test; and full range of motion in lumbar spine, but with pain. Campbell assessed degeneration of the lumbar and lumbosacral intervertebral disc; congenital spondylolisthesis; and thoracic or lumbosacral neuritis or radiculitis. (Tr. 464-466) Siverd followed-up with Campbell on August 22, 2014, November 19, 2014, June 3, 2015 and August 27, 2015. (Tr. 553, 541, 631, 678)

Siverd followed-up with Dr. Sunmonu on July 15, 2014. Siverd had diminished breath sounds and prolonged expirations bilaterally. Dr. Sunmonu assessed shortness of breath, severe COPD with chronic associated bronchitis. At her previous visit, Siverd had been started on nocturnal oxygen for nocturnal hypoxia. Notes from this visit state that Siverd had cut down to a few daily cigarettes. (Tr. 461-462)

Siverd went to the emergency room on October 7, 2014 reporting that she was having an episode of mental health disorder. Siverd was diagnosed with depression and was told to follow up with her family physician, Dr. Lee. (Tr. 513-520)

Siverd met with Sanjay Srivastava, M.D., at the pulmonary clinic for a follow up on December 23, 2014. Siverd was running low on her inhalers. Siverd medications and oxygen

were continued. Siverd was smoking 4-5 cigarettes each day. Dr. Srivastava discussed Siverd's need to completely quit smoking. (Tr. 535-537)

Siverd followed up with the Pain Clinic on February 18, 2015. The clinic also performed a functional status assessment. Siverd reported feeling back and right leg pain that would wake her at night. Her right lower extremity motor strength was reduced to 4/5 and straight leg raising tests on the right were positive. Lumbar range of motion was decreased due to pain. Siverd was assessed with degeneration of lumbar and lumbosacral intervertebral disc, thoracic or lumbosacral neuritis or radiculitis and congenital spondylolisthesis. Siverd's prescriptions were renewed. (Tr. 530-531)

Siverd also met with Dr. Lee on February 18, 2015. Siverd complained of cough and phlegm production. She was diagnosed with sinusitis. Dr. Lee also noted COPD and nasal congestion. (Tr. 523) Siverd met with Dr. Lee again on March 11, 2015 with a sore throat and possible thrush. (Tr. 659-660)

Siverd presented to the emergency room on May 13, 2015 complaining of severe shortness of breath. She was admitted for "at least" two days due to her hypoxia and was advised that she needed to stop smoking. The next day, Siverd left the hospital without being discharged and without any prescriptions. (Tr. 559-563)

Siverd met with Dr. Sunmonu on May 19, 2015. Notes indicate that Siverd's chronic breathing problem was worsening and that she had been admitted last week for two days to the hospital for COPD exacerbation. She had diminished breath sounds and prolonged expirations bilaterally on examination. (Tr. 644-646) Siverd also followed-up with Dr. Lee after her hospitalization. (Tr. 638)

5

Siverd met with Dr. Sunmonu on July 14, 2015. Dr. Sunmonu noted continued worsening of Siverd's breathing and cough and diagnosed emphysema with no focal mass or infiltrate. (Tr. 625-626) Siverd met with Dr. Lee on August 20, 2015. She was out of albuterol and Dr. Sunmonu was out of the office. Siverd also complained of right hip pain. (Tr. 682)

The administrative record contains literally dozens of doctor directives to Siverd to stop smoking. Despite these constant instructions, she never did even though doctors told her many times that her conditions – particularly her lung condition – would worsen if she continued smoking.

### C. Opinion Evidence

#### 1. Treating Physician – Dr. John Lee – March 2015

Dr. Lee completed a medical questionnaire regarding Siverd's physical abilities and limitations on March 11, 2015. Dr. Lee listed Siverd's diagnoses as low back pain, hip pain, hypertension, COPD, chronic bronchitis, hypothyroidism, thoracic or lumbosacral neuritis or radiculitis, and nocturnal hypoxia. Dr. Lee opined that Siverd could work one hour a day; stand for 15 minutes at one time; could stand less than 60 minutes in a workday; could sit less than 15 minutes at one time and for less than 60 minutes in a workday; and could lift less than five pounds. He further opined that she could never bend, stoop, balance, work around dangerous equipment or operate a motor vehicle. He felt that Siverd could occasionally use fine and gross manipulation with both hands; raise her arms over shoulder level, and tolerate heat, cold, dust smoke, fumes, noise and heights. He opined that Siverd would miss work more than three times a month. (Tr. 666)

## 2. Reviewing Physicians – Leigh Thomas, M.D. and Leslie Green, M.D.

Leigh Thomas, M.D., reviewed Siverd's records on March 28, 2014. (Tr. 170-172) Dr. Thomas opined that Siverd had a severe back disorder, COPD and osteoarthrosis and related disorders. She opined that Siverd would occasionally be able to lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand, walk and sit for a total of six hours in an eight hour workday; and was unlimited in her ability to push and pull. She opined that Siverd could frequently climb ramps and stairs; stoop, kneel, crouch and crawl; occasionally climb ladders, ropes and scaffolds and was unlimited in her ability to balance. Siverd would need to avoid concentrated exposure to extreme cold, heat, fumes, odors, dusts, gases and poor ventilation. She must avoid even moderate exposure to machinery and heights. (Tr. 170-172)

On May 2, 2014, Leslie Green, M.D., reviewed Siverd's records and agreed with the opinions expressed by Dr. Thomas. (Tr. 180-182)

### D. Testimonial Evidence

#### 1. Siverd's Testimony

At the August 28, 2015 hearing[1], Siverd testified:

- She attended high school through the 11th grade and got her GED in 1979. (Tr. 118)

- Siverd was living with her twenty-five year old son and his big brown dog. (Tr. 131)

- Siverd's son did most of the housework, yard work, and grocery shopping. (Tr. 122) Siverd's neighbor also helped around the house. (Tr. 124)

- Siverd's last job was through a temporary agency working as a quality control inspector checking overhead parts. She worked there for almost a year. (Tr. 119)

- Before that, Siverd did some housekeeping in hotels where she was required to lift between 25-35 pounds. (Tr. 120)

---

[1] The ALJ and VE participated in the hearing by telephone. (Tr. 112

7

- From 2000 to 2011, Siverd was taking care of her aging parents. She lived with them and did not work during that time. (Tr. 120)

- Siverd usually woke up around 8:00 a.m. She had difficulty breathing in the morning. She coughed and used her inhalers before drinking coffee and taking her medicines. Siverd rarely left her house. She watched TV and read books. (Tr. 122-123)

- Siverd complained of pain in her sciatic nerve. This pain made it difficult for her to sit or lie down comfortably. She moved around frequently trying to get comfortable. She also had trouble sleeping and tried to sleep in a sitting position. (Tr. 123, 125-126)

- Siverd had cut back on her smoking. She was smoking about three cigarettes a day and wearing a nicotine patch. (Tr. 126)

- Siverd was taking medications for high blood pressure, low thyroid, COPD, using an inhaler, oxygen and a nicotine patch. Siverd first used oxygen only at night, but she was now using it during the day also. She was using it four times a day. (Tr. 129)

- Siverd had a driver's license but did not like to drive long distances. A friend had driven her to the hearing. (Tr. 131)

### 2. Vocational Expert's Testimony

Vocational Expert ("VE") Barbara Allen Burk testified:

- The VE considered Siverd's past work to be that of rubber goods inspector tester and housekeeping cleaner and kitchen helper. (Tr. 133-134)

- The ALJ asked the VE to consider a hypothetical individual similar to the Siverd in age, education and work history who was limited to less than a full range of light work. The individual could lift and/or carry 10 pounds frequently and 20 pounds occasionally, could sit, stand and/or walk for six hours in an eight-hour day; could push and pull as much as she could lift and/or carry; could frequently climb ramps and stairs; could never climb ladders, ropes or scaffolds; could frequently stoop, kneel, crouch and crawl; could occasionally be in an environment of unprotected heights, moving mechanical parts or where she operated a motor vehicle; could frequently be exposed to humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold and extreme heat. (Tr. 135-136)

- The VE opined that this individual would be able to perform Siverd's past jobs of rubber goods inspector tester and housekeeping. (Tr. 136) She could also perform the jobs of cashier, cashier wrapper, cashier checker and fast food worker. Each of these jobs existed in significant national numbers. (Tr. 137)

8

- The ALJ then asked the VE to consider a hypothetical individual who was limited to less than a full range of sedentary work. She could lift and/or carry 10 pounds occasionally and 20 pounds frequently; she could sit for six hours in an eight hour workday; and could push and pull as much as she could lift and/or carry. She would need to bring bottled oxygen to the workplace to use as necessary. (Tr. 138)

- The VE testified that this individual would not be able to perform Siverd's past work or any other work. (Tr. 138)

- Siverd's attorney then asked the VE to assume that the first hypothetical individual was limited to occasional fine and gross manipulation with both hands and occasional overhead bilateral reaching. (Tr. 139)

- The VE testified that the individual would not be able to perform the jobs listed – or any other jobs. The VE further testified that there would not be any jobs available for an individual who needed to take an hour off after four hours of work for oxygen or a nebulizer. No work would be available for a person who missed more than three times a month. (Tr. 139)

## IV. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[2]....

42 U.S.C. § 423(d)(2)(A).

---

[2] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## V.    ALJ's Findings and Decision

On September 21, 2015, the ALJ issued the following summarized findings:

1. Ms. Siverd had not engaged in substantial gainful activity since February 14, 2014, the application date. (Tr. 94)

2. She had the following severe impairments: chronic obstructive pulmonary disease and degenerative disc disease of the lumbosacral spine. (Tr. 94)

3. Ms. Siverd did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 94)

4. Siverd had the residual functional capacity ("RFC") to perform a reduced range

of light work. She could lift, carry, push or pull 10 pounds frequently and 20 pounds occasionally. She could sit, stand, and walk six hours of each eight-hour workday; she could climb ramps and stairs frequently. She could never climb ladders, ropes or scaffolds. She could frequently stoop, kneel, crouch and crawl. She was limited to occasional exposure to unprotected heights and moving mechanical parts. She could occasionally operate a motor vehicle. She was limited to frequent exposure to humidity, wetness, dusts, odors, fumes and pulmonary irritants, extreme cold and extreme heat. (Tr. 96)

5. Siverd was able to perform her past relevant work as a housekeeper and a rubber goods inspector/tester. (Tr. 99)

Based on these findings, the ALJ determined that Ms. Siverd was not under a disability since February 14, 2014, the application date. (Tr. 102)

## VI. Law & Analysis

### A. Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the

record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court must also determine whether proper legal standards were applied. If not, reversal is required unless the error of law is harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S.

Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

      **B.**      **Treating Physician Rule[3] – Dr. Lee's Opinion**

Siverd raises one issue – that the ALJ's opinion is not supported by substantial evidence because it violated the treating physician rule when evaluating the opinion of Dr. John Lee, D.O.[4] The administrative regulations implementing the Social Security Act impose standards on the weighing of medical source evidence. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). In making determinations of disability, an ALJ evaluates the opinions of medical sources in accordance with the nature of the work performed by the source. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013). The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

If the ALJ does not give the opinion controlling weight, then the opinion is still entitled to significant deference or weight that takes into account the length of the treatment and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. 20 C.F.R. § 416.927(c)(2)-(6). The ALJ is not required to explain how he considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938 ("In addition to balancing the factors to determine

---

[3] The regulations governing the handling of treating source evidence have been revised for claims filed after March 27, 2017. See 20 C.F.R. § 416.927. Siverd filed her claim before the revision took effect.
[4] ECF Doc. 15, Page ID# 479-482.

what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned."). "These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (July 2, 1996)) (internal quotation marks omitted).

A failure to follow these procedural requirements "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based on the record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007). The Sixth Circuit Court of Appeals "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned." *Cole*, 661 F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original) (internal quotation marks omitted).

> Regarding Dr. Lee's opinion, the ALJ stated:
>
> I give less weight to Dr. Lee's treating source opinion because his opinions regarding the effects of the claimant's severe impairments are more restricted than his treatment notes and other medical evidence from Dr. Sonmonu [sic] establish (Exh. 17F; *but see generally* Exhs. 1F; 2F; 12F; 16F). A treating physician's medical opinion cannot be given "controlling weight" unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques. (SSR 96-2p). Moreover, "even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is 'not inconsistent' with the other 'substantial evidence' in the case record" (SSR 96-2p; *see also* 20 CFR 404.1502, 404.1527, 416.927). Accordingly, I do not give Dr. Lee's opinion controlling weight. (Exh. 17F)

(Tr. 99)

The ALJ inadequately explained his rejection of Dr. Lee's opinion. He provided one reason for assigning less weight to Dr. Lee's opinion – that Dr. Lee's opinions were more restrictive than his own treatment notes and those of Dr. Sunmonu. He generically cited Dr. Lee's medical source statement and several records, but he did not make any effort to identify specific parts of these records he concluded were inconsistent with the opinions in Dr. Lee's medical source statement.

In *Friend v. Comm'r of Soc. Sec.,* 375 Fed. App'x. 543, 552 (6th Cir. 2010), the court held that it "it was not enough to dismiss a treating physician's opinion as "incompatible" with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." Here, the ALJ did not identify specific discrepancies; he merely cited the records by exhibit number. In order to affirm the ALJ's decision, the court would be required to review the cited records and uncover the inconsistencies on its own. But reviewing the records cited by the ALJ does not reveal the inconsistencies found by the ALJ. Even if portions of these records could be construed to contradict Dr. Lee's opinions, there are portions of them that appear to support his opinions. For example, Exhibit 16F contains notes from Dr. Sunmonu indicating that Siverd had chronic shortness of breath and cough that were worsening and labored breathing when walking less than ½ street block. (Tr. 625) It is unclear how this treatment note is less restrictive than the opinions expressed by Dr. Lee. This demonstrates the need for a more specific identification of the portions of the treatment notes that would have supported the ALJ's decision to assign little weight to Dr. Lee's opinion.

The ALJ also did not express how he took into account the length of the treatment, the frequency of the treatment relationship, or the consistency of Dr. Lee's opinion with the record

as a whole. In her brief, the Commissioner argues that the ALJ properly evaluated Siverd's subjective complaints and weighed the medical evidence.[5] For example, the Commissioner invokes the considerable evidence that Siverd continued to smoke despite her allegations of disabling limitations arising from her COPD. Unfortunately, the ALJ did not relate the issues of Siverd's credibility, her smoking, or the other medical evidence in the record to his decision to assign little weight to Dr. Lee's opinions. He only listed some of the records without any explanation as to how they were inconsistent with Dr. Lee's opinions. Thus, even though the Commissioner's persuasive array of record citations could have supported the ALJ's decision, this court cannot simply assume that the ALJ considered the cited records for the propositions urged by the Commissioner. The court may neither speculate on the basis of the ALJ's decision nor accept the Commissioner's *post hoc* rationalizations. *Smart v. Comm'r,* 2012 U.S. Dist. LEXIS, *22 (S.D. Ohio December 7, 2012), quoting *Hyatt Corp. v. N.L.R.B.,* 939 F.2d 361, 367 (6th Cir. 1991).

The only reason the ALJ stated for assigning little weight to Dr. Lee's opinions was that they were more restrictive than certain portions of records that he cited generally. The ALJ did not identify what the specific discrepancies were, and, in the case of the contended discrepancy with the views of Dr. Sunmonu, the record of her findings contains opinions that seem consistent with Dr. Lee's. Making a generic reference to the records of a supposedly opposing physician who expresses mixed opinions neither identifies an "inconsistency with the record as a whole" nor inconsistency with that opposing physician's views in particular. Here, the ALJ failed to build a logical bridge between his decision and the medical evidence. The purpose of the "good

---

[5] The Commissioner includes these arguments in her brief despite the fact that Siverd did not raise these issues. In reply, Siverd contends that the Commissioner included these arguments in an attempt to pack in as much of the defense's rationale as possible instead of discussing the ALJ's actual rationale for rejecting Dr. Lee's opinion. ECF Doc. 17, Page ID# 829.

reasons" requirement is two-fold. First, a sufficiently clear explanation, "lets the claimants understand the disposition of their cases," particularly where a claimant knows that her physician has deemed her disabled and therefore "might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Rogers,* 486 F.3d at 242 (quoting *Wilson* 378 F.3d at 544). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. In this case, the ALJ failed to provide a clear explanation for assigning little weight to Dr. Lee's opinion.

In some circumstances, an ALJ's failure to articulate "good reasons" for rejecting a treating physician opinion may be considered "harmless error." These circumstances are present when (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion," or (3) "the Commissioner has met the goal of § 1527(d) – the provision of the procedural safeguard of reasons – even though he has not complied with the terms of the regulation. "*Wilson,* 378 F.3d at 547. *See also Cole,* 661 F.3d at 940. In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of the doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments. *See Nelson v. Comm'r of Soc. Sec.,* 195 Fed. Appx. 462, 470-471 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.,* 148 Fed. Appx. 456, 464 (6th Cir. 2005); *Friend,* 375 Fed. Appx. at 551. "If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused." *Id.*

17

Here, the ALJ's stated reason for rejecting the opinion of Siverd's treating physician is inadequate. He did not identify specific portions of the records that supported his decision to assign little weight to Dr. Lee's opinion, and he did not express himself in such a way that we can know that he fully consider all of the elements contemplated by 20 C.F.R. § 416.927(c)(2)-(6). For these reasons, the undersigned finds that the ALJ's failure to provide sufficiently specific "good reasons" for rejecting Dr. Lee's opinion regarding Ms. Siverd's limitations was not harmless error. Even if good reasons existed to reject Dr. Lee's opinion, the ALJ failed to articulate those reasons with sufficient specificity to allow for meaningful review. The court should reject the ALJ's determination.

## VII. Recommendation

Because the ALJ did not properly apply Social Security regulations or make it clear that he had a proper basis for discounting the views of Siverd's treating doctor, I recommend that the final decision of the Commissioner be VACATED and that the case be REMANDED, pursuant to 42 U.S.C. § 405(g), for further proceedings consistent with this Report and Recommendation.

Dated: November 22, 2017

Thomas M. Parker
United States Magistrate Judge

---

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).

18